IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINA HAIR, | ) ) ) |
| *Plaintiff*, | ) ) Case No.  2:23-CV-370 |
| v. | ) ) ) **JURY TRIAL DEMANDED** |
| WEST VIRGINA UNIVERSITY OF MEDICINE UNIONTOWN HOSPITAL, | ) ) ) |
| *Defendant*. | ) ) ) ) |

## COMPLAINT IN CIVIL ACTION

AND NOW comes Christina Hair (hereinafter, "Plaintiff" and/or "Ms. Hair"), who now files this Complaint in Civil Action (hereinafter, the "Complaint") averring as follows:

### I. INTRODUCTION

1. During her tenure of employment with her former employer, West Virginia University of Medicine Uniontown Hospital (hereinafter, "The Defendant" and/or "The Hospital"), Ms. Hair was subjected to discrimination based upon her age and gender and retaliation for engaging in protected activity which denied her basic human rights, subjected her to emotional anguish and distress, and caused Ms. Hair significant pecuniary losses after Defendant terminated her employment.

2. Premised on the facts below, Ms. Hair's rights protected by the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* (hereinafter, the "ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII"), the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* (hereinafter, the "PHRA"), and the related state and federal statutes which shielded Ms. Hair from retaliatory adverse employment actions for asserting said rights, were flagrantly violated by the Hospital.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

4. This Court has supplemental jurisdiction over the causes of action arising under 43 P.S. § 333.101, *et seq.*, pursuant to 28 U.S.C. § 1367(a) as these claims share the operative facts at issue within the claims arising under 29 U.S.C. § 201, *et seq*.

5. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in the United States District Court for the Western District of Pennsylvania (hereinafter, the "District") because Defendants' business operations are located in the District; Plaintiff was employed by Defendant in Fayette County, Pennsylvania which is within the geographic scope of the District; and the events or omissions giving rise to the claims occurred in the District.

7. Moreover, Plaintiff has satisfied all procedural and administrative requirements set forth in 29 U.S.C. § 626 and 42 U.S.C. § 2000e-5 in that:

> a. On or about June 27, 2022, Plaintiff filed a timely administrative complaint alleging age and gender discrimination and retaliation with the Equal Employment Opportunity Commission (hereinafter, the "EEOC").

      b. On or about December 08, 2022, Plaintiff received permission for the right to sue from the EEOC, wherein Plaintiff was afforded ninety (90) days within which to timely file an action in federal or state court. With the filing of the instant Complaint, Plaintiff has hereby satisfied that procedural requirement.

### III. PARTIES

8. Plaintiff is an adult individual who resides at 252 Connellsville Street, Dunbar, Pennsylvania 15431.

9. Defendant is in the business of owning and operating a hospital, formed under the laws of Pennsylvania within the Commonwealth of Pennsylvania, located at 500 West Berkley Street, Uniontown, Pennsylvania 15401.

### IV. MATERIAL FACTS

#### 1. Background

10. Ms. Hair is an adult female over the age of forty-five (45).

11. On or about February 21, 2000, Ms. Hair began working for Uniontown Hospital as a staff nurse.

12. Defendant's Director of Nursing, Lisa Manetta ("Ms. Manetta"), and Chief Nursing Officer, Rebecca Ambrosini ("Ms. Ambrosini"), hired Ms. Hair.

13. In early 2004, Judy Meadows ("Ms. Meadows") replaced Ms. Manetta as Director of Nursing.

14. In October of 2004, Ms. Hair became the team leader for the Oncology/Medical-Surgical Unit, consisting of "4 East" and "4 South," being two (2) hallways.

15. In November of 2004, Cathy Bartock ("Ms. Bartock") replaced Ms. Meadows as Director of Nursing on 4 East and 4 South.

16. In 2008, Ms. Hair was promoted to the Nursing Director of the Medical Surgery Unit.

17. Betty Ann Rock ("Ms. Rock") replaced Ms. Ambrosini as the Chief Nursing Officer.

18. In August of 2018, Ms. Hair had hip surgery performed on her to correct a prior surgery.

19. Ms. Hair was expected to return by the end of November of 2018.

20. In October of 2018, Beth Carolla, ("Ms. Carolla") replaced Ms. Rock as Chief Nursing Officer after Ms. Rock was terminated.

21. As Chief Nursing Officer, Ms. Carolla engaged in a pattern and practice of terminating the employment of experienced administrators over the age of forty (40) and/or forcing their resignation.

22. In mid-November of 2018, Ms. Carolla reassigned the Director of the Clinical Resource Center, Lori Matthews (hereinafter, "Ms. Matthews"), fifty-six (56) years of age at the time, to Director of 2 East South North; and soon after to the less desirable position of Stroke Coordinator and Supervisor.

23. Ms. Carolla then asked Ms. Hair to replace Ms. Matthews who did after she returned to work on or about November 28, 2018 after recovering from surgery.

24. Ms. Matthews resigned shortly thereafter because Ms. Carolla intentionally made her new position unnecessarily difficult by constantly changing her schedule and work hours, and piling on new duties and expectations.

25. In addition to being the new Director of the Clinical Resource Center, Ms. Hair also accepted the additional duties of receiving patient calls from communications officers.

26. The calls involved addressing questions and concerns from a patient's family members and friends who provided a privacy code to ensure patient consent and confidentiality.

27. In early 2019, Jeremy White ("Mr. White"), twenty-eight (28) years of age at the time, became the Director of "1 West" and "1 East/ South" and replaced Ms. Hair as the Director of the Medical Surgery Unit.

28. In early 2019, Ms. Carolla, removed Diana Heneks ("Ms. Heneks"), in her 50's at the time, as the Director of Social Work and Physician Liaison/ Outreach Coordinator and reassigned her solely to Physician Liaison/ Outreach Director.

29. Shortly thereafter, Ms. Heneks's position as Physician Liaison/Coordinator was eliminated and she was terminated as a result.

30. It is believed, and therefore averred, that Ms. Carolla moved Ms. Heneks to the Physician Liaison/coordinator position knowing the position would soon be eliminated.

31. In 2019, Ms. Carolla also eliminated the administrative secretary position held by Adrienne Ryans (hereinafter, "Ms. Ryans"), who was in her 50's at the time, which resulted in her termination of employment.

32. During the COVID-19 pandemic in late 2019, the Hospital and Ms. Hair faced a variety of new challenges and changes to protocol.

33. Friends and family were no longer permitted to visit patients and Ms. Hair faced a substantial increase in their calls.

34. In June of 2020, Ms. Carolla added the responsibility of being Interim Director of the Intensive Care Unit to Ms. Hair's list of duties and responsibilities after forcing the former Director of the Intensive Care Unit, Denise Satanek (hereinafter, "Ms. Satanek") out and into an educator role. Ms. Satanek was in her 50's at the time.

35. In December of 2020, Ms. Carolla removed Ms. Hair from Interim Director of the Intensive care Unit and provided it to a younger but qualified male, being Jarred McMaster ("Mr. McMaster") who was thirty-one (31) years of age at the time.

36. Both Mr. McMaster and Mr. White identify as homosexual and got engaged to be married in 2020.

## 2. Discriminatory Discipline

37. On or about October 20, 2021, Ms. Carolla met with Ms. Hair and questioned her about an anonymous complaint made against her.

38. The complaint alleged that Ms. Hair was "inappropriately accessing a medical record" of a COVID-19 patient.

39. The patient passed away on or about November 5, 2021.

40. Ms. Hair cooperated with Ms. Carolla and was confident that she did not violate hospital policy or HIPPA.

41. Ms. Hair offered in her defense that answering questions from a patient's family and friends who produce the privacy code was one of her duties.

42. Ms. Hair explained that the patient's son, a paramedic, always provided the code when he called, and she responded to him by answering the son's questions and accessing the records as needed.

43. The anonymous complaint did not come from the patient's family.

44. Ms. Carolla performed an incomplete investigation by failing to speak with the patient's son and spouse.

45. Ms. Carolla was unable to articulate to Ms. Hair exactly how she violated hospital policy or HIPPA.

46. However, thirteen (13) days later, on November 2, 2021 at approximately 12:30 p.m., Ms. Carolla served Ms. Hair with a five (5) day suspension, without pay, to be served from November 8 through 12, 2021.

47. The suspension came as a surprise to Ms. Hair.

48. Earlier on November 2, 2021, a complaint about a younger nurse, Brittany Kay (hereinafter, "Ms. Kay") was brought to the attention of Ms. Hair and Ms. Carolla.

49. A complaint alleged that Ms. Kay violated hospital policy and HIPPA by accessing her ex-husband's chart out of personal curiosity.

50. Ms. Hair performed an initial investigation that proved Ms. Kay did not have a legitimate business reason to access the private emergency room records of her ex-husband nor his permission to do so.

51. Ms. Hair forwarded the complaint to Ms. Carolla and human resources who served Ms. Kay, thirty-three (33) years of age at the time, with only a two (2) day suspension for her serious violation of hospital policy and federal law.

### 3. Protected Activity

52. As soon as Ms. Hair received her (5) five-day suspension from Ms. Carolla on November 2, 2021, she complained to Ms. Carolla about age discrimination, referencing Ms. Kay's more lenient discipline.

53. Ms. Carolla became visibly angry at Ms. Hair's discrimination complaint and explained that Ms. Hair was, "a member of the leadership team and held to a higher standard."

54. Ms. Hair then complained that younger, similarly situated men, Mr. White and Mr. McMaster, also members of the leadership team, were not disciplined at all for engaging in the same conduct as her.

55. Ms. Carolla became even more upset and told Ms. Hair, "You are an embarrassment to the leadership team."

56. Later on November 2, 2021, both Mr. McMaster and Mr. White confirmed with Ms. Hair that they acted similarly to her by accessing patient records when responding to calls from patient friends and family who provided a privacy code.

57. Mr. McMaster and Mr. White confirmed that they were never disciplined for accessing records and were surprised to learn that Ms. Hair was.

58. Later in the day on November 2, 2021, Ms. Hair emailed a complaint to C.E.O., Dr. David Hess ("Dr. Hess").

59. Ms. Hair met with Dr. Hess in mid-December of 2021 to discuss the discriminatory discipline she received and Ms. Carolla's insulting comments.

60. Dr. Hess expressed sympathy for Ms. Hair but said there was nothing he could do because the decision was made on a "system level."

61. Dr. Hess told Ms. Hair that she was not "an embarrassment" and should have a "good future" with the hospital.

62. On or about February 10, 2022, Ms. Hair worked in "bed placement" and had access to patients' medical records.

63. On or about February 10, 2022, all the directors met as they usually do at the "daily bed meeting" and discussed their patients.

64. Mr. McMaster spoke about his terminal patient, a patient Ms. Hair personally knew (hereinafter, "The Patient").

65. Ms. Hair accessed the patient's storyboard to assist with Mr. McMaster's discussion, which was the usual custom and practice.

66. Later in the day on February 10, 2022, Ms. Hair visited the patient.

67. Ms. Hair spoke with the patient's family at the hospital.

68. The family was cordial with Ms. Hair and expressed appreciation for her visit.

69. The patient passed away on February 11, 2022.

70. The patient's daughter texted Ms. Hair to inform her of his death and to thank her for visiting.

71. The daughter asked whether Ms. Hair knew how many years her father served on a local municipal borough council for purposes of writing his obituary.

72. Ms. Hair did not know offhand, but called the borough and got the answer from the council president and forwarded the information to the daughter.

### 4. Discriminatory and Retaliatory Termination of Employment

73. On or about March 11, 2022, Ms. Carolla, serving Human Resources Director and C.F.O., Barb Weiss (hereinafter, "Ms. Weiss") and privacy officer, Stacey Clark (hereinafter, "Ms. Clark") met with Ms. Hair.

74. Human Resources Director, Joanne Kaminsky (hereinafter, "Ms. Kaminsky") also joined the meeting via telephone.

75. Ms. Weiss asked Ms. Hair about the patient who passed away and told her that the hospital received another anonymous complaint that Ms. Hair sent a group text message to his former borough council that informed them that the patient was in the hospital and that he passed away.

76. Ms. Hair denied the accusations because she sent no such text messages.

77. Ms. Hair offered her telephone and messages for review and Ms. Weiss reviewed them.

78. Ms. Weiss pivoted away from the allegation of sending text messages and asked Ms. Hair, "Did you access his chart?"

79. Ms. Hair said she could not recall, which was her honest answer at the time.

80. Ms. Weiss claimed Ms. Hair was in the patient's "story board" for four (4) minutes on February 10, 2022 at 9:14 a.m.

81. Ms. Hair shared her personal calendar showing she was working in bed placement on February 10, 2022 and was at the bed placement meeting at 9:14 a.m.

82. Ms. Hair shared her recollection of accessing the patient's records at the daily bed meeting in response to Mr. McMaster's discussion, which was consistent with her duties.

83. Ms. Hair also shared the telephone number for the patient's daughter.

84. It is believed and averred that the hospital called the patient's daughter and the daughter supported Ms. Hair's version of events because the daughter called Ms. Hair after speaking with the hospital and shared the details of the conversation.

85. Although neither Ms. Carolla nor Ms. Weiss could articulate a violation of hospital policy or HIPPA, they terminated Ms. Hair's employment on March 15, 2022.

86. Ms. Carolla said the reason for the termination was that Ms. Hair inappropriately accessed the patient's chart on February 10, 2022, which is not true.

87. The hospital's offered reason in support of discharge is a pretext for unlawful discrimination and retaliation because accessing patient charts was part of her job.

88. The patient's daughter subsequently emailed the hospital and complained that Ms. Hair was terminated.

89. The anonymous complaint, if any, did not come from the patient's family.

90. Ms. Hair ultimately received unemployment compensation because there was no evidence to support Defendant's contention that she violated any policy.

91. Ms. Hair was not replaced.

92. Ms. Hair partially mitigated her wage loss by acquiring an hourly position at a nursing home on or about April 18, 2022.

93. Despite the mitigation, Ms. Hair is suffering an annual loss of over Thirty-seven Thousand Dollars ($37,000.00) per year.

94. Defendant's discriminatory discipline of Ms. Hair exacerbated her anxiety and resulted in Ms. Hair increasing her prescribed medication.

## V. CAUSES OF ACTION

### COUNT I
### AGE DISCRIMINATION IN VIOLATION OF THE ADEA AND PHRA
### 29 U.S.C. §§ 621, *et seq.* and 43 Pa. Cons. Stat. § 951, *et seq.*

95. Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

96. "The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).

97. But the test "is not 'intended to be rigid. "Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Id*. (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

98. The ADEA makes it "unlawful for an employer … to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)

99. At all times relevant to this Complaint, Plaintiff was over the age of forty (40).

100. At all times relevant to this Complaint, Plaintiff was qualified for the position held.

101. Plaintiff suffered adverse employment actions from Defendant in the form of discipline and more severe discipline than similarly situated younger employees who acted as she did, being Ms. Kay, Mr. McMaster and Mr. White.

102. Plaintiff and similarly situated coworkers over the age of forty (40), being Ms. Matthews, Ms. Heneks, and Ms. Satanek and Ms. Ryans suffered disparate treatment from Defendant because of their age.

103. Defendant's offered reasons in support of the discipline and discharge of Plaintiff are false.

104. Plaintiff was not replaced.

105. As direct result of age discrimination, Plaintiff suffered the loss of a valuable job, wages and benefits and suffered substantial emotional harm.

**COUNT II**
**GENDER DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PHRA**
**42 U.S.C. § 2000e, *et seq.* and 43 Pa. Cons. Stat. § 951, *et seq.***

106. Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

107. Title VII provides that "[i]t shall be an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e2(a)(1).

108. To establish a prima facie case of gender discrimination a Plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

109. At all times relevant to this Complaint, Plaintiff is female.

110. At all times relevant to this Complaint, Plaintiff was qualified for the position held.

111. Plaintiff suffered adverse employment actions from Defendant in the form of discipline and not provided to similarly situated male employees who acted as she did, being Mr. McMaster and Mr. White.

112. Plaintiff and similarly situated female coworkers, being Ms. Matthews, Ms. Heneks, and Ms. Satanek and Ms. Ryans all suffered disparate treatment because of their gender.

113. Defendant's reasons in support of the discipline and discharge of Plaintiff are false.

114. As direct result of gender discrimination, Plaintiff lost a valuable job, wages and benefits and suffered substantial emotional harm.

## COUNT III
### RETALIATION FOR COMPLAINING ABOUT AGE DISCRIMINATION
### 29 U.S.C. § 621, *et seq.*, 43 Pa. Cons. Stat. § 951, *et seq.*

115. Plaintiff incorporates all previous paragraphs as if fully set forth at length herein.

116. "To establish a *prima facie* case of retaliation under …. The ADEA, a plaintiff must show that (1) she engaged in protected activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action." *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 231-32 (3d Cir. 2007).

117. "For retaliation purposes, an adverse employment action is one that would dissuade a reasonable employee from making or supporting a charge of discrimination." *Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 n.56 (E.D. Pa. 2020).

118. Plaintiff engaged in protected activity by complaining about age discrimination with regard to her five (5) day suspension for allegedly accessing medical records inappropriately.

119. Within a short proximity of time after engaging in protected activity, being approximately (3) three months, Plaintiff suffered an adverse employment action in the form of a termination of employment.

120. Defendant's offered reason in support of discharge is false.

121. As direct result of retaliation, Plaintiff lost a valuable job, wages and benefits and suffered substantial emotional harm.

## COUNT IV
### RETALIATION FOR COMPLAINING ABOUT GENDER DISCRIMINATION
### 42 U.S.C. § 2000, *et seq.*, 43 Pa. Cons. Stat. § 951, *et seq.*

122. Plaintiff incorporates all previous paragraphs as if fully set forth at length herein.

123. "To establish a prima facie case of retaliation under …. Title VII, a plaintiff must show that (1) she engaged in protected activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action." *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 231-32 (3d Cir. 2007).

124. "For retaliation purposes, an adverse employment action is one that would dissuade a reasonable employee from making or supporting a charge of discrimination." *Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686 n.56 (E.D. Pa. 2020).

125. Plaintiff engaged in protected activity by complaining about gender discrimination with regard to her five (5) day suspension for allegedly accessing medical records inappropriately.

126. Within a short proximity of time after engaging in protected activity, being approximately (3) three months, Plaintiff suffered an adverse employment action in the form of a termination of employment.

127. Defendant's offered reason in support of discharge is false.

128. As direct result of retaliation, Plaintiff lost a valuable job, wages and benefits and suffered substantial emotional harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Christina Hair, respectfully requests this Honorable Court to enter judgment in her favor, and against Defendant and prays for relief as follows:

1. Declare and find that Defendant committed one or more of the following acts:

    i. Willfully violated provisions of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.;*

ii. Willfully violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*;

iii. Willfully violated the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.*; and

iv. Retaliated against Plaintiff for engaging in protected activity.

2. Lost wages and benefits and other compensation denied or lost to Plaintiff by reason of Defendant's unlawful acts;

3. Liquidated and punitive damages where accorded by law;

4. Pre-judgment and post-judgment interest where accorded by law;

5. Reasonable attorney's fees and costs of suit incurred prosecuting these claims;

6. Injunctive and other equitable relief as provided by law;

7. Grant leave to amend to add claims under state and federal laws as necessary; and

8. Such other and further relief as this Court deems just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

By: _____
Kyle H. Steenland (Pa. I.D. No. 327786)
Erik M. Yurkovich (Pa. I.D. No. 83432)
The Workers' Rights Law Group, LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412.910.9592
Facsimile: 412.910.7510
kyle@workersrightslawgroup.com
erik@workersrightslawgroup.com

*Attorney for Plaintiff, Christina Hair*

**VERIFICATION**

I, Christina Hair, have read the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: 3/6/23

_Christina Hair_
Plaintiff, Christina Hair